1               IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3    KELLOGG BROWN & ROOT SERVICES,)

4    INC.,                        )

5             Plaintiff,          ) Case No.

6                vs.              ) 13-236C

7    THE UNITED STATES OF AMERICA, )

8             Defendant.          )

9

10                        Suite 715

11            Howard T. Markey National Courts Building

12                 717 Madison Place, N.W.

13                     Washington, D.C.

14                 Wednesday, June 26, 2013

15                      3:06 p.m.

16            Oral Argument on Motion to Dismiss

17

18            BEFORE: THE HONORABLE VICTOR J. WOLSKI

19

20

21   Elizabeth M. Farrell, CERT, Transcriber

22   For The Record, Inc.

23   10760 Demarr Road

24   White Plains, Maryland 20695

25   (301) 870-8025

```
1    APPEARANCES:

2    ON BEHALF OF THE PLAINTIFF:

3              RICHARD B. OLIVER, ESQ.

4              MATTHEW CARTER, ESQ.

5              McKenna Long & Aldridge, LLP

6              300 South Grand Avenue

7              14th Floor

8              Los Angeles, CA 90071-3124

9              (213)243-6169

10             roliver@mckennalong.com

11

12                     and

13

14             HERBERT FENSTER, ESQ.

15             RAYMOND BIAGINI, ESQ.

16             McKenna Long & Aldridge, LLP

17             1900 K Street, N.W.

18             Washington, D.C.

19             (202)496-7500

20

21                     and

22

23             MARK LOWES, ESQ.

24             SHARON STAGG, ESQ.

25             Kellogg Brown and Root Services, Inc.
```

1    ON BEHALF OF THE DEFENDANT:

2              ALEX P. HONTOS, ESQ.

3              U.S. Department of Justice - Civil Division

4              P.O. Box 480

5              Ben Franklin Station

6              Washington, D.C. 20044

7              (202)514-4643

8              alex.hontos@usdoj.gov

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3      Oral Argument:                          Page:

4      By Mr. Oliver                           6

5      By Mr. Hontos                           44

6      By Mr. Oliver                           54

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2                    -    -    -    -    -
 3              THE COURT:  Good afternoon.  This is Judge Wolski.
 4    Can we have counsel please state their appearance for the
 5    record, beginning with the Plaintiff.
 6              MR. OLIVER:  Your Honor, good afternoon.  For
 7    Plaintiff, Kellogg Brown and Root Services, Inc., this is
 8    Richard Oliver, attorney of record.  In Los Angeles with me,
 9    I have Matthew Carter.  On a separate line in our Washington,
10    D.C. office, I have my partners, Herb Fenster and Ray
11    Biagini, and KBR attorneys Mark Lowes and Sharon Stagg.
12              THE COURT:  Very well.  Welcome to you all.
13              I assume, Mr. Oliver, you'll be the only one that
14    we need to keep track of your voice for purposes of the
15    digital recorder, right?
16              MR. OLIVER:  Yes, Your Honor.
17              THE COURT:  Very good.  Well, welcome to you all.
18              For the Defendant?
19              MR. HONTOS:  Good afternoon, Your Honor.  Alex
20    Hontos with the Department of Justice for the Defendant.
21              THE COURT:  Good afternoon, Mr. Hontos.  I'm here
22    in chambers with two of my law clerks, Jesse Duddy and Justin
23    Mallone, who you might remember from the last argument, and
24    also our intern, Ryan Zumwalt, is here.
25              Since we're resuming the argument on the
```

1   government's motion to dismiss and, normally, we would allow

2   the moving party to go first, but since this is pursuant to

3   the supplemental briefing that I had requested and pursuant

4   to the request of the Plaintiff that it be covered further in

5   oral argument, I think what I'd like to do is break from the

6   normal precedent and start with Mr. Oliver for KBR Services,

7   if I may.

8         MR. OLIVER:  Thank you, Your Honor, and thank you

9   for this opportunity to address this issue further, the issue

10  of whether non-trivial competitive injury is required to

11  establish standing for KBR in this protest.  You know,

12  just -- we -- I believe we've covered this in some detail in

13  our supplemental brief, but I wanted just to walk through a

14  couple of what I consider very key points.

15        First, of course, the Federal Circuit has adopted

16  the Competition and Contracting Act's statutory definition of

17  interested party for bid protests under the Tucker Act.  And

18  that definition contains two prongs.  The first is that the

19  protester must be an actual or prospective bidder, and the

20  second is the protester must have a direct economic interest

21  that would either be affected by contract award or a failure

22  to make contract award.

23        One of the key points, Your Honor, that I'd like to

24  make is that, as the Federal Circuit explained in 2012, in

25  Systems Application and Technologies, in determining what

1    constitutes a direct economic interest, a protest will, by

2    its nature, dictate the necessary factors.

3         So, for example, prior to Weeks Marine, the

4    standard for direct economic interest was that a protester

5    had to have a substantial chance of award.  And in Weeks

6    Marine, both the -- the Federal Circuit recognized that in a

7    pre-award competitive context, the protest jurisdiction, a

8    different standard was necessary.  If they weren't --

9    otherwise, they would never be able to exercise pre-award bid

10   protests, because in a pre-award situation, where you're just

11   challenging the terms and conditions of the solicitation, an

12   offeror can't show that it had a substantial chance of award.

13        And the Federal Circuit was flexible, and they

14   accepted the plain suggested standard of non-trivial

15   competitive injury, which was borrowed from the Winstar

16   holding, but the Federal Circuit found this standard was

17   satisfied by the protester having a direct economic stake in

18   the solicitation being carried out in accordance with the

19   governing regulations and statutes.  I note that the opinion

20   indicates no discussion that the Court considered a situation

21   of a sole source protest or that the Court intentionally

22   decided to exclude sole source protest.  That question simply

23   was not before the Federal Circuit.

24        In Systems Application and Technologies, the

25   Federal Circuit was flexible in finding that the Court had

1    jurisdiction over protests, challenging corrective actions.

2    Even though the protester was technically an awardee, the

3    Court made some broad findings here that the Tucker Act

4    grants jurisdiction to objections, the statute of regulatory

5    violations in connection with the procurement, and that a

6    narrow application of the Tucker Act does not comport with

7    the Tucker Act's broad grant of jurisdiction.

8           Indeed, Your Honor, CBY Design Home Builders held

9    that a non-frivolous allegation of a violation of regulation

10   or statute was sufficient to establish jurisdiction and,

11   certainly, KBR meets that standard.

12          THE COURT:  But wouldn't that standard also be met

13   in any breach of contract action in which there is some

14   alleged violation of a statute or regulation?  Are you saying

15   that the CDA and -- despite the fact that the CDA seems to be

16   in mandatory terms for purposes of procurements of goods and

17   services, that the CDA could be dispensed with and a party

18   could go directly into our court without first filing a claim

19   with the contracting officer if they've got a breach claim so

20   long as the -- so long as the breach claim involves -- is

21   based, in part, on a violation of statute or regulation?

22          MR. OLIVER:  No, Your Honor.  It's not -- it's not

23   that broad.  If someone is an awardee -- in Systems

24   Application -- of course, that was a challenge to a

25   corrective action.  And the Federal Circuit, in that case,

1    found that there would be jurisdiction under the bid protest

2    jurisdiction.

3            THE COURT:  But --

4            MR. OLIVER:  That was challenging not the award,

5    but really the decision to undo the award through corrective

6    action.

7            THE COURT:  No, no, I understand that, and I've got

8    no doubt that the -- and I -- I mean, I know several of my

9    colleagues have disagreed with this approach, but I always

10   was of the opinion that when a contract has been awarded and

11   is shortly thereafter terminated for convenience in the

12   course of some sort of a corrective action that's going to

13   reopen the solicitation for bidding, that that's a

14   circumstance of which an awardee can bring a claim directly

15   in the Court of Federal Claims, because they're being

16   inflicted upon -- under the ADRA, because inflicted upon them

17   is the sort of competitive injury that they would have

18   compete a second time for the same award.

19           So, to the extent that people might have thought

20   that that was a breach that goes under the CDA, I don't think

21   that's right.  But, again, it's always in the context of a

22   competitive award.  And what I find interesting is that -- I

23   mean, the purpose of the substantial chance test isn't to

24   make sure that people can establish standing.  The purpose of

25   the non-trivial competitive injury test isn't to make sure

1   that some people can establish standing.  The purpose of

2   those tests is to determine if somebody is objecting to

3   something that actually comes within the purview of the bid

4   protest jurisdiction that we're given.

5        And the substantial chance test -- a better way, I

6   think, of looking at that is that what a Complainant is

7   complaining about or objecting to is an action by a

8   government agency that deprived them of the substantial

9   chance they otherwise would have had to receive a contract.

10  When you don't have enough information to evaluate the

11  relative standing of the various offerors in a pre-award

12  context in which, say, the terms of the solicitation are

13  being challenged, then what the Federal Circuit has adopted

14  is a test to see if there is non-trivial competitive injury,

15  because your direct economic impact is of a competitive

16  nature.  So that if the government has done something

17  illegally or contrary to a regulation that would make it

18  harder for you to compete to win, you have standing to bring

19  a bid protest.

20       But the purpose of those isn't to make sure that

21  there's some people that have standing.  The purpose of those

22  is to describe the circumstances in which bid protests are

23  really being presented to our court.  And those circumstances

24  are circumstances in which somebody could have won the

25  contract but for what the Government did or would have had a

1    better chance to win the contract and a stronger chance of

2    winning the contract but for what the Government did.  I

3    don't know of any circumstance in which the party who's

4    complaining is the only party with whom the Government is

5    dealing and in which they don't like the offer that's been

6    made to them, so that they're not objecting -- they're not

7    trying to preclude the contract from being awarded to

8    somebody else.

9           That's the circumstance in a sole source award

10   that's being challenged by somebody, whether they're

11   challenging the award or the proposed award or whether

12   they're challenging a violation of law or a statute or

13   regulation in connection with that.  What they're complaining

14   about is that they want to have a chance to compete.  And by

15   using a sole source vehicle, they're being precluded from

16   competition.

17          The essence of a bid protest is that a competitor

18   is being excluded or being rejected or not being -- not even

19   being allowed to participate at all in any sort of

20   competition.  It's not presented, I think -- or I've yet to

21   see a case where it's presented in which you've just got the

22   only party to whom the government is seeking to negotiate a

23   contract with complaining about the terms.  To me, that

24   doesn't seem to be a bid that's being -- it's not a bidding

25   process where somebody's bidding against other people.

1    That's just a flat-out, like, negotiation of a contract in

2    which somebody doesn't like or doesn't accept the offer or

3    would rather make a counter-offer.

4            Unlike the bid protest circumstance, where if --

5    where because of the wrong or incorrect action of the

6    government, you may be cheated out of a contract, here,

7    there's nothing the Government can do to give anybody else

8    the contract because there's nobody else who's competing for

9    the contract.  That's why I have difficulty understanding

10   still how this comes under the bid protest rubric.  That's

11   why, I think, for direct economic impact, the definition in

12   the pre-award context that was adopted by the Circuit is a

13   non-trivial competitive injury, which can be addressed by

14   judicial relief.

15           Again, in SATECH, you mentioned, SATECH said that

16   in pre-award protests, for instance, the plaintiff must show

17   -- must show a non-trivial competitive injury which can be

18   addressed by judicial relief.  Now, this is a pre-award case,

19   isn't it?

20           MR. OLIVER:  Yes, Your Honor.

21           THE COURT:  So that according to SATECH, the

22   plaintiff must show a non-trivial competitive injury which

23   can be addressed by judicial relief.  Is there any case that

24   says that -- after that test was adopted that says that you

25   don't meet it?  I mean, it's significant that -- the use of

1    the word "competitive," I think.

2             MR. OLIVER:  Well, yeah, Your Honor, clearly they

3    did use non-trivial competitive injury.  But I think if you

4    look at the decision in Weeks Marine, I think they adopted a

5    standard that was a lesser standard than the substantial

6    chance of award.  They adopted it from Winstar.  But the

7    idea --

8             THE COURT:  But it still is a competitive --

9             MR. OLIVER:  -- of a sole source procurement was

10   not before them.  And as we heard in SATECH, you know, the

11   Federal Circuit explained that what constitutes a direct

12   economic interest will be dictated by the nature of the

13   procurement, so the nature of the protest.

14            In SATECH, you know, they faced a unique situation

15   regarding whether there was jurisdiction over correction

16   action.

17            THE COURT:  But a corrective action is in a

18   competitive context, and if a corrective action is making

19   somebody win twice to have a contract, that's the non-trivial

20   competitive injury.  I know that from SATECH because they

21   relied on my decision in CBY, I think, to reach that.  That's

22   -- it's a competitive injury.

23            MR. OLIVER:  Well, Your Honor, the Tucker Act

24   allows protest of -- excuse me.  It allows -- there's nothing

25   in the Tucker Act requiring competition, and the Tucker Act

1    also allows protest of a violation of a statute or regulation

2    in connection with the solicitation.  And that's clearly what

3    we have here.

4              THE COURT:  But it's a solicitation for offerors,

5    in the plural.

6              MR. OLIVER:  There's no requirement in the Tucker

7    Act for competition, per se.

8              THE COURT:  But it's a solicitation for offerors,

9    in the plural.  It's not just a solicitation -- it's not a

10   one-off agreement with one party giving that party the

11   ability to object.  I mean, otherwise, you'd have like a --

12   settlement agreements could then be the source of a bid

13   protest suit.  Any sort of solicitation just dealing with one

14   party would be the basis of a bid protest suit, when the

15   purpose of bid protests is to ensure that competition occurs

16   when competition is required.

17             There's nothing competitive at all about the

18   negotiations, if that's what they are, over how KBR Services

19   are going to be compensated for the close-out activities of

20   their prior contract.  I still don't understand how that's --

21   how that comes under it.

22             If the -- I mean, SATECH, you've got -- it's a

23   competitive circumstance.  I mean, every single case is

24   either a competitive circumstance or it's somebody who thinks

25   there should have been a competitive circumstance and is

1    objecting to a sole source award.  You don't want there to be

2    a competitive circumstance, do you?  You don't want there to

3    be more than one offeror competing for your close-out

4    activity.  So, I don't see then how it's a bid -- how your --

5    it's a bid protest.  There are no bids.  There are no --

6    there's no competition.

7            MR. OLIVER:  Well, Your Honor, I would respectfully

8    suggest that the Tucker Act doesn't have a requirement for

9    competition, per se.

10           THE COURT:  But this -- but this --

11           MR. OLIVER:  And I would also suggest that, as we

12    pointed out in our brief, that if you were to rule that a

13    non-trivial competitive industry standard is appropriate even

14    in a situation of sole source circumstances, then we would

15    have situations where a contractor is required to accept the

16    contract under the Defense Production Act where the

17    contractor is economically dependent on the Government.  And

18    in those situations, it would be --

19           THE COURT:  Well, first of all, your second --

20           MR. OLIVER:  -- violation of regulation or statute.

21           THE COURT:  Well, your second -- the second

22    example, I think, doesn't make any sense at all to me.  So, I

23    won't -- about the dependent on the Government or not.  But

24    the first circumstance, if the Government makes a final

25    action, takes a final action that affects the interest of

1    somebody by requiring them to perform a contract that they

2    never agreed to, I think, under those circumstances, if it's

3    not covered by the ADRA, it's not covered by a bid protest

4    jurisdiction, if it's a final agency action, it could be

5    brought in the District Court, challenging the government

6    action under the APA.

7            The APA still exists.  I know there's a dispute

8    whether or not once the concurrent jurisdiction that was

9    given to the District Court and us expired under the ADRA,

10   whether or not the Scanwell jurisdiction still lasts under

11   the APA, and there's at least one or two circuits -- at least

12   the Tenth Circuit, I think, if I recall correctly -- that

13   might believe that it does.

14           But to the extent that things aren't given to us

15   under the bid protest jurisdiction of the ADRA, if it meets,

16   via an APA action definition, challenge to a final agency

17   action that's aggrieving or affecting the rights of somebody,

18   they could go into District -- so, in the circumstance where

19   a contract is forced upon somebody that they didn't want,

20   rather than using the Contract Disputes Act, they may well be

21   able to use the APA in that circumstance.

22           But, I mean, the Circuit, in many cases, has

23   explained that the whole point of the ADRA was to marriage

24   -- it was to be a marriage -- marriage is on people's minds

25   today -- marriage between the Scanwell jurisdiction over bid

1    protests that district courts had and our implied contract

2    theory of jurisdiction over bid protests and that those two

3    things were being put together.  But it was always -- it was

4    always based on the phrase or the words "bid protest," that

5    bid protest is a term of art, bid protest means something.

6    It means when somebody is trying to bid -- trying to compete

7    to get a contract.

8         You don't dispute that before ADRA there's not one

9    case in our court or our predecessor courts' reports of

10   somebody bringing a challenge to a sole source contract that

11   they've been offered -- the prospective awardee of a sole

12   source contract that's being offered to them, challenging

13   that under the old implied contract to fairly, honestly

14   consider, right?

15        MR. OLIVER:  No, Your Honor, but I would add that

16   prior to Systems Application, there was no case law

17   supporting jurisdiction for challenges to corrective action

18   and prior to --

19        THE COURT:  Baloney, baloney, what about the CBY

20   case?  What about the SATECH case below?  What about the

21   Jacobs case?  What about Turner?  What about SendTech?  I

22   mean, there was a -- what about Chapman?  I mean, there were

23   a whole bunch of cases in which corrective action was

24   challenged.  And at least in our court, they were recognized

25   and the Federal Circuit upheld some of those.

1          MR. OLIVER:  Well, it's -- in this situation, there

2     would be no judicial forum to hear a protest of a sole source

3     -- in a sole source circumstance.

4          THE COURT:  Yes, there would.

5          MR. OLIVER:  In Emery, the Seventh Circuit --

6          THE COURT:  No, no, no, no, no, but that's post

7     award.  That was a challenge to the award.  An interested

8     party can challenge an award or a proposed award.  But I've

9     never heard anyone challenge an award to themselves or a

10    proposed award to themselves successfully.  There have been

11    several cases recently that have been brought, I think, where

12    someone tried to do that.  I think Judge Firestone may have

13    just issued an opinion a couple of days ago in the -- I think

14    it was the Trailboss case.

15         MR. OLIVER:  Trailboss, Your Honor.

16         THE COURT:  So, people are trying this, but it's

17    never been recognized as us having jurisdiction over

18    somebody's challenge to their own award that they're

19    receiving.

20         MR. OLIVER:  Yes, Your Honor.  In the Trailboss

21    case that you're referring to, the protestor, Trailboss, was

22    clearly the awardee of the procurement and they, after

23    several delays due to protests, they wanted out, and -- and,

24    so, they tried to protest their own award.  That's a lot

25    different situation than what we have here where we're

1      challenging a prospective solicitation for calendar year --

2      all of calendar year 2013 close-out activities.  So, I don't

3      think the Trailboss situation -- you know, it's easily

4      distinguished.

5              Your Honor, I'd like to just make a couple more

6      points, if I may.

7              THE COURT:  Sure.

8              MR. OLIVER:  At our last hearing, there was some

9      discussion about the possibility that KBR could make a

10     proposal using fixed billing rates per hour, and I just want

11     to --

12             THE COURT:  Yes, yes, please.

13             MR. OLIVER:  -- note that the record is clear that

14     the Army is insisting upon a single fixed price for the

15     entire calendar year 2013 and they're requiring that KBR

16     submit costs -- certified costs and pricing data to support

17     that price.

18             THE COURT:  Well, how could they require something,

19     though?  What happens if you don't do it?

20             MR. OLIVER:  Well, we --

21             THE COURT:  I mean, they're only required to do

22     something if you -- are they acting under the Defense

23     Production Act?

24             MR. OLIVER:  Not yet, Your Honor.

25             THE COURT:  Okay.  Are they ordering you to do

1    something under a contract?  Do you have some contractual

2    obligation to do something?

3              MR. OLIVER:  Well, the -- they still believe that

4    the modification to Task Order 160 is valid and they can make

5    orders here.  And, of course, we've, you know, discussed in

6    our other brief, in our opposition, that both the task order

7    and the LOGCAP III contract expired almost a year-and-a-half

8    ago.

9              THE COURT:  But if the -- if the Government is

10   requiring somebody to do something under a contract that's

11   beyond the scope of the contract for whatever reason, isn't

12   that a typical sort of thing that gets handled through the

13   Contract Disputes Act?

14             MR. OLIVER:  Well --

15             THE COURT:  And if there's Contract Dispute Act

16   jurisdiction --

17             MR. OLIVER:  Your Honor, let me just add this.

18             THE COURT:  Yeah.

19             MR. OLIVER:  If KBR accepts a firm fixed price

20   proposal -- submits a firm fixed price proposal and is bound

21   to a firm fixed price contract, there is no meaningful remedy

22   under the Contract Disputes Act because all the case law

23   indicates that, in that situation, the contractors assume the

24   risk of overruns and under-runs.

25             THE COURT:  Well, you say that, but where -- I

1    mean, is that -- wait, where -- is that part of the case law?

2    I mean, I've not seen anything cited.  I've seen the assume

3    the risk cited.  But even if you're assuming the risk of

4    that, why are you assuming the risk of a clause that is

5    inappropriate in a contract?  I mean, can't you challenge the

6    term in the CDA anyway?  I mean, what would --

7             MR. OLIVER:  Well, Your Honor, this is a -- this is

8    a term of a solicitation and under Blue and Gold Fleet, we

9    have to challenge it prior to contract award.

10            THE COURT:  What if you don't accept it then?  I

11   mean, nobody's forcing you to accept it.  You're not required

12   to accept the request, are you?  How could the Government

13   require you unless it's under -- unless they've got a

14   contractual obligation to do so?  And if the Government

15   misunderstands and thinks a contract imposes greater

16   obligations than a plaintiff does, that's the sort of thing

17   that all the time comes under the CDA.  You file a claim with

18   the contracting officer.  You're seeking an equitable

19   adjustment or you're alleging a breach.  You're alleging

20   something that's wrong with the way they're administering the

21   contract.  And after they give a decision or after a

22   reasonable time runs and they don't, and then you bring it

23   here.

24            I mean, don't -- doesn't KBR Services have, like,

25   several CDA claims currently pending in our court that relate

1      to LOGCAP III?  It's possible to go and use the CDA.

2              MR. OLIVER:  Well, it is for contracts that have

3      already been awarded, Your Honor.  I certainly agree with

4      that.  But this is a solicitation for work going forward

5      and --

6              THE COURT:  But if you've got no obligation to do

7      -- if your existing contract doesn't oblige you to respond to

8      it, there's no more injury -- you've got no more dispute with

9      the Government than if the Government said, here, write down

10     on a piece of paper how much money you want to pay us

11     tomorrow.  You could say, what are you talking about?  I'm

12     not going to write that down.  Forget that.

13             And so what?  Then nothing happens.  You're under

14     no obligation to do anything.  If you're out money because

15     the Government owes you money for close-out costs, the only

16     reason the Government would owe you money for close-out costs

17     is because they arose out of the other contract and that

18     other contract can be the subject of the CDA claim.  I mean,

19     I don't see what would preclude that.

20             MR. OLIVER:  Well, Your Honor, as we explained at

21     the previous hearing, with the particular circumstances of

22     this case, including the need to support the greatly delayed

23     DCAA audits and to defend litigation in which the -- KBR is a

24     defendant because it followed the directions of the

25     Government and the Government has sovereign immunity, you

1    know, KBR is not in a position to just stop work on these

2    kinds of activities.  And that's why they need contractual

3    coverage.

4              THE COURT:  But if the Government's not obligated

5    to pay them, then there's no obligation.  If the Government

6    is obligated to pay them, it's under a contract that already

7    exists and, as a consequence, you should be able to go to the

8    contracting officer and ripen a CDA claim.

9              MR. OLIVER:  Okay.  But what -- you're right.  But

10   we're talking about a contract that does not exist, which is

11   a solicitation for all of the close-out work for calendar

12   year 2013.

13             THE COURT:  So, in the absence of the solicitation

14   then, you would not be -- you would not conduct any close-out

15   work and you would not get compensated for any close-out

16   work?

17             MR. OLIVER:  Well, we would certainly have to

18   conduct some close-out activities, Your Honor, because in

19   cases -- in lawsuits where we are the defendant, we need to

20   continue to defend ourselves.  So, we cannot -- I don't think

21   the other judges would be too happy with us if we stopped.

22   So, that -- that will continue.

23             Obviously, some of the close-out activity would

24   either be slowed down or stopped.  It could be.

25             THE COURT:  Okay.  Now, let me get back to

1    something that we were discussing earlier because I want to

2    make sure that I understand what you're saying and that you

3    understand what I'm saying, that from your brief, I

4    understand that there are circumstances in which sole source

5    arrangements can be challenged in a bid protest context.  I

6    have never seen a circumstance, though, in which the awardee

7    or the proposed awardee of a sole source contract, such as

8    here KBR Services would at least be the proposed awardee of

9    any potential contract, challenged the terms of the contract

10   that was offered to them.  Are you aware -- and you're not

11   aware of any, right?

12            MR. OLIVER:  No, Your Honor, I'm not aware of any.

13            THE COURT:  Now, when people are challenging --

14   when other people are challenging sole source contracts, it's

15   because they, themselves, are prospective offerors for that

16   contract if it were made competitive.  That's the competitive

17   aspect that gives us a hook for a bid protest.

18            In a corrective action, even though you've got a

19   contract awardee who is bringing the action to challenge the

20   corrective action, it's based on the notion that there's a

21   competitive injury to them and that they are being forced a

22   second time to compete to win the same contract.  It's,

23   again, a circumstance which involves other offerors.

24            The circumstance in which people are challenging

25   solicitations -- the ADRA specifically says solicitation for

1    offerors in the plural.  It's not talking about a request

2    made to one individual.  It's a request made to everybody.

3    Now, the request made to one individual in the case of a sole

4    source can be -- can be challenged by those other people, but

5    it's usually challenged in the context of the award or even

6    the proposed award once there's a notification given that we

7    intend to give it to these people unless you tell us to the

8    contrary why it's bad.

9             But, again, those are all circumstances in which

10   it's somebody else who's trying to win a contract that might

11   go to another party.

12            Here, there's nobody else that's trying to win this

13   contract.  In fact, there's nobody that's trying to win this

14   contract if I understand the Plaintiff's position because the

15   Plaintiff doesn't even want it on the terms that it's

16   offered.  But the Plaintiff can't be stuck with it because if

17   it's a new contract and they don't accept the offer, then you

18   are where you are, in which case the Government would have to

19   then come back with another request or you can make a

20   counter-offer saying we're not going to submit a proposal to

21   do this on a firm-fixed-price basis.  We don't believe it's

22   possible.  Here, instead, is our proposal on a cost

23   reimbursement basis.  And see what happens.

24            But there's no way that it's going to go to

25   somebody else because, by definition, this can't go to

1    somebody else because it arises out of your contract.  And

2    that's why I don't understand that there's no -- the reason

3    to me why there are no other bid protest cases ever reported

4    in which standing has been found for a party who is objecting

5    to an offer that's made to them and them alone is because it

6    doesn't present the sort of competitive context that -- or a

7    potential competitive context that the bid protest

8    jurisdiction is designed for.

9          So, I mean, I've covered corrective action.

10   Corrective action challenges fit in here.  I've covered sole

11   source awards to somebody else.  Sole source awards fit in

12   here.  I've covered proposed awards or awards to other

13   people.  But never is there a circumstance where it's just

14   one -- one offeror and the Government dealing with each other

15   and the offeror trying to challenge it, nor is there any

16   standing for awardees to challenge their own awards, even if

17   it is in a competitive context like the Trailboss case.

18         And that's the difficulty I have with your proposal

19   or your argument for jurisdiction is that it doesn't seem to

20   fit into the bid protest arena.  And it may well be the case

21   that, in Distributed Solutions, when the Federal Circuit said

22   that procurement begins here and ends there and that's the

23   whole thing, that the whole point of Distributed Solutions --

24   what the Court wasn't concerning itself with when challenges

25   to a procurement may end under our bid protest jurisdiction.

1   What they were determining is when would they begin, the

2   beginning point.

3          And since we have jurisdiction over allegations of

4   violations of statute or regulation in connection with the

5   proposed procurement, proposed procurements begin with this

6   earlier stage.  The Circuit didn't address whether there's a

7   particular stage in the procurement process where somebody

8   who had been an offeror changes hats and now becomes an

9   awardee and that, for matters going forward, no longer are

10  proposed offerors or potential -- potential bidders or

11  potential offerors were offerors, but are now in a different

12  standing as a contractor.

13         So, I'm not sure that Distributed Solutions really

14  solves the question of whether or not something that

15  otherwise would have come under our bid protest jurisdiction,

16  based on the language of the ADRA, ceases because the party

17  that was an interested party is now a contractor and a

18  contractor's claims must come under the CDA.

19         MR. OLIVER:  Well, Your Honor, I understand your

20  position and where I -- where I'm trying to persuade you

21  without much luck, apparently, is that really I believe

22  nothing in the Tucker Act requires the competition -- in the

23  plain language of the statute, it talks about an alleged

24  violation of statute or regulation in connection with a

25  procurement or proposed procurement.  And, certainly,

1    procurement includes sole source procurements.

2         And in the SATECH case, which you mentioned, the

3    Federal Circuit warns us against a narrow application of the

4    Tucker Act which does not comport with the statute's broad

5    grant of jurisdiction over objections to the procurement

6    process.  And what I think the Army is doing in this

7    solicitation for calendar year 2013 close-out activities is

8    certainly part of the procurement process and we're objecting

9    to it.

10        I appreciate we're walking on new ground and we're

11   -- it's not like there's precedent, but I think we're within

12   the express language of the statute and the case law.

13        THE COURT:  Yeah, I guess, though, the problem I

14   have is that sometimes the express language isn't good enough

15   and that the Federal Circuit places a gloss on it that I've

16   got to follow.  And in this particular context, unless we're

17   talking about the -- I know that there was another Federal

18   Circuit decision that was around the time of SATECH, whose

19   name utterly eludes me now.  I'll probably remember it

20   tonight while I'm trying to sleep or something.

21        But there's another case in which it was a pre-

22   award case because somebody had been -- had challenged their

23   exclusion from the competitive range and the question was

24   whether or not the substantial chance test applied or the

25   non-trivial competitive injury test applied.  And in that

1    context, because there was an evaluation that could determine

2    whether or not they should be -- they should stay in under

3    the substantial chance test.

4           But, generally, pre-award challenges to the terms

5    of a solicitation under Weeks, the test that was adopted by

6    the Federal Circuit was non-trivial competitive injury.  They

7    said, "Must show non-trivial competitive injury."  And

8    because they said that, I mean, I'd be reluctant to say that

9    -- to come up with some exception to what the Federal Circuit

10   is saying.

11          MR. OLIVER:  Well, Your Honor -- Your Honor, in the

12   Weeks Marine, at the Court of Federal Claims level, Judge

13   Wheeler -- even though prior to Weeks Marine, the standard

14   was a substantial chance of award, Judge Wheeler recognized

15   that that was not an appropriate standard for a pre-award.

16   And he was the one who initially found that the non-trivial

17   competitive injury standard was more appropriate.  And so, he

18   did not follow the Federal Circuit case law but recognized

19   the flexibility to address --

20          THE COURT:  And I guess --

21          MR. OLIVER:  -- you know, more unique

22   circumstances.

23          THE COURT:  But I guess the problem there -- but

24   the problem there is that it was because they didn't have the

25   information to determine if they had a substantial chance to

1    have an award.

2           Here, we have all the information, we know.

3    There's nothing that the Government's doing that would

4    preclude you from having -- I mean, it's the opposite of

5    losing a substantial chance at the award.  I mean, the

6    Government's trying to give you the award.  So, it's a

7    completely different sort of circumstance.

8           It's not a -- I mean, the substantial chance -- the

9    reason why substantial chance is adopted is because they're

10   trying to see whether a person -- whether one party, vis-a-

11   vis, another party is wasting the Court's time in trying to

12   get a contract award.  Non-trivial competitive injury is used

13   when there's not enough information to determine that.  We

14   want to make sure that it's not just some random person off

15   the street that can't possibly fulfill a contract who's

16   complaining about the procedure or solicitation term or

17   something that's put in place that's going to make it harder

18   for them to win when there are somebody that could perform

19   the contract.

20          Here, there isn't that sort of an injury, though.

21   Nobody's trying to prevent you from getting anything other

22   than a better contract than the one that was offered to you,

23   if indeed the request is viewed as sort of an offer to

24   contract with you for something.  And that's what I have

25   trouble -- I have difficulty with.

1          Now, the -- the -- you don't dispute, do you, that

2     if this is not a new -- if this is not a new procurement, but

3     if this is something that's arising out of or connected to

4     the existing LOGCAP III contract, that the CDA would apply to

5     that, right, if that were the case?  If LOGCAP III were still

6     in existence.

7          MR. OLIVER:  If we were back in 2009 and we were

8     within the 10-year period of LOGCAP III, then I would say

9     that the Government does have a right to solicit close-out

10     activity proposals at that point and we would not be looking

11     to file a bid protest.  And, indeed, the Federal Circuit --

12     excuse me, the Court of Federal Claims wouldn't have

13     jurisdiction over that because that would be a task order

14     protest.

15          THE COURT:  Okay.  And if a matter could be brought

16     under the CDA, but also could be phrased as one perhaps that

17     would come under our bid protest jurisdiction, is it your

18     position that the -- if the CDA could be used, it could be

19     avoided and bid protest jurisdiction could be, instead,

20     invoked?

21          MR. OLIVER:  Your Honor, that's kind of a tough

22     hypothetical because it's -- you know, we do have the statute

23     and the total contract period is only ten years and we're a

24     year-and-a-half past that and the LOGCAP III contract is

25     over.  That doesn't mean that the Government can't justify a

1    new contract to KBR to do the close-out work.  And that's

2    actually how the parties have been acting the last year-and-

3    a-half.  But there's no -- there's no existing contract under

4    which a CDA claim could be done, and --

5         THE COURT:  So, you don't have one --

6         MR. OLIVER:  -- second, as I said before --

7         THE COURT:  So, you didn't bring any CDA claims --

8    or your client hasn't brought any CDA claims in the last

9    year-and-a-half?

10        MR. OLIVER:  Not for work that they're not

11   contracted for yet.  This is for new -- we're talking about a

12   solicitation for new work.

13        THE COURT:  But -- so, that -- but that entirely

14   then hinges on your -- your characterization of the close-out

15   activities is not something that's necessary or vital or a

16   part of the old contract.

17        MR. OLIVER:  Well, it hinges on the fact that the

18   statute says, in clear language, that the total contract

19   period is ten years and the ten years has run.

20        THE COURT:  But if that's the case, and then if the

21   Government then decides not to enter -- there's no obligation

22   and it decides not to enter into a new contract with you for

23   close -- on close-out, then -- then that's it.  I mean, you

24   don't -- if there's no obligation of the Government to pay --

25   if there's no obligation of KBR under the current contract to

1      do the close-out and if the Government is seeking to

2      negotiate with you a new contract to do the close-out and you

3      don't like the terms, then just don't agree.

4              MR. OLIVER:  Well, in our circumstances, Your

5      Honor, what you're saying is if we can't file a bid process

6      challenging the terms of the solicitation that violates

7      statute and regulation, then we have no remedy, and even as

8      we are forced to go forward by the realities of our

9      situation, we would have no remedy to challenge it and,

10     indeed, there's never going to be a remedy to challenge a

11     firm-fixed-price contract once you accept it --

12             THE COURT:  But the problem --

13             MR. OLIVER:  -- because that --

14             THE COURT:  But the problem there is not caused --

15     the problem is not -- the lack of a remedy is not caused by

16     me.  It's not even caused by the ADRA.  It would be caused by

17     the fact that you entered into a contract that statutorily

18     terminated before you did all you needed to do to get paid.

19     And under your theory, you can't get paid by doing any

20     further.  But that's the problem with the contract you

21     entered into.

22             I mean, if the statute is precluding you from doing

23     additional things to get additional money that's due you

24     based on your obligation under the old contract, for things

25     you did under the old contract, well, that's just a bad

1    contract you entered into.  It's not the Court's fault.  It's

2    not the bid protest jurisdiction's fault.  It's not Congress'

3    fault.  It's not Senator Cohen's fault, who proposed the

4    ADRA.  It's just a bad contract you entered.  But we don't

5    exist to redo bad contracts.

6            MR. OLIVER:  Well, Your Honor, I have -- I've been

7    trying to convince you to -- that this notion of competition

8    is not a required prerequisite for standing, and there's

9    nothing in the language of the Tucker Act that so requires.

10   I haven't persuaded you that the plain language of the Tucker

11   Act doesn't include that competitive component.

12           THE COURT:  Well, I guess there's -- the problem is

13   that the Federal Circuit has interpreted the ADRA language as

14   encompassing Scanwell bid protest jurisdiction and our old

15   bid protest jurisdiction.  But it's always use of the term

16   "bid protest," which the Circuit even interpreted as being

17   cases being brought by disappointed bidders.  It's for a

18   circumstance in which there's more than one person -- more

19   than one person who would want to obtain a contract.

20           I don't know -- I mean, if you -- if you're reading

21   of it were correct, that would mean that at any point in a

22   contract, any dispute that a contractor has with the

23   Government concerning whether or not a law or regulation is

24   being violated could come -- could be brought as a bid

25   protest rather than a CDA.

1          MR. OLIVER:  No, Your Honor, it's not that broad.

2     We're just looking at a solicitation for new work that's not

3     covered by the contract.  And as I mentioned in our brief,

4     the changes clause is actually fairly narrow in what the

5     Government can do, and they can't willy-nilly add new work to

6     a contract.  Instead, there's a -- they're limited on the

7     changes they can make.  So, those kinds of disputes under an

8     existing contract would not -- would not qualify as a bid

9     protest under the standing argument that I'm arguing.

10          THE COURT:  I guess if you're basing your argument

11     on the plain language of the Tucker Act and there's nothing

12     then that would indicate why that plain language wouldn't

13     also apply to any CDA claim that involved a violation of law

14     or regulation, I don't quite -- I mean, it seems to me that's

15     the necessary implication.  If all we're looking at is just a

16     phrase in the Tucker Act in isolation and that phrase in the

17     Tucker Act in isolation would seem to cover something that

18     would also be covered under the Contract Disputes Act, it

19     seems to me that under -- at least the Federal Circuit seems

20     to have suggested that the Contract Disputes Act is the way

21     to go about trying to resolve it.

22          MR. OLIVER:  Well, again, we're talking about new

23     work that's not under the contract.  The Contract Disputes

24     Act covers work that's already been contracted for.

25          THE COURT:  So, now, you're in --

1          MR. OLIVER:  That's the dividing line.

2          THE COURT:  But now you're in the circumstance in

3     which it's not a solicitation for offerors; it's a

4     solicitation for one offeror -- for one offeror, which I

5     think is contrary to the language of the Tucker Act and has

6     no precedent, even though, you know, there have been

7     countless examples of sole source contracts that the

8     Government has entered into over the ages, which, you know,

9     maybe -- there's always got to be a first time for every

10    case, I suppose, right?

11         MR. OLIVER:  Yes, Your Honor.  And, again, you

12    know, the -- and maybe I'm taking this out of context, but in

13    CBY Design Builders, you said concerning the last phrase of

14    the provision, the -- any alleged violation of statute or

15    regulation in connection with a procurement or a proposed

16    procurement, you said that a non-frivolous allegation of a

17    statutory or regulatory violation, in connection with a

18    procurement or a proposed procurement, is sufficient to

19    establish jurisdiction.

20         THE COURT:  Again, that was in the context, though,

21    of like the evaluation or bid protest activity.  If it was a

22    violation of law or regulation by the agency in evaluating

23    offerors or something or the procedure that they followed,

24    that could be challenged.  It could be challenged if you're

25    excluded even if it hasn't been -- hasn't resulted in an

1    award yet or a proposed award, or if the violation occurred

2    in the context of a GAO bid protest or something.  But those

3    are all -- it's already a competitive circumstance that it's

4    being presented in.  I mean, it was unnecessary to say "in a

5    competitive circumstance" because that's -- that's what we

6    were presented with.

7              MR. OLIVER:  Well, certainly, Your Honor, there's

8    no question that was a competitive circumstance.  But I --

9    the language of the Tucker Act does not preclude a sole

10   source circumstance and, indeed, it would have been easy for

11   Congress to have said competitive -- inserted the word

12   "competitive" if that's what they really intended.  So, I

13   just --

14             THE COURT:  And it also doesn't say -- but it also

15   doesn't say that anyone who bid, even if they were not

16   qualified as a bidder, could challenge.  I mean, it's been

17   narrowed beyond what could be the broadest possible reading

18   just by the Federal Circuit looking at people who have a

19   substantial chance in post-awards or have a non-trivial

20   competitive injury inflicted upon them in the pre-award.

21             Well, let me ask you this, what is the economic

22   injury?  What is the direct economic injury from the

23   Government asking you to submit a proposal that you don't

24   agree with?

25             MR. OLIVER:  Well, we didn't -- the direct economic

1    injury of submitting a firm fixed price proposal would be the

2    --

3            THE COURT:  But you're not submitting.  You're not

4    submitting a proposal.  There's no submission of a proposal.

5    There's nothing -- the Government can't require you to submit

6    the proposal.  All they've done is requested something.  How

7    has the request, itself, created a direct economic impact?

8            MR. OLIVER:  I mean, as we said, Your Honor, in our

9    supplemental brief, you know, we talked about a direct

10   economic stake.  You know, certainly, if we don't submit a

11   proposal, you know, then we're not going to be bound by the

12   usual firm-fixed-price contract.

13           But the economic harm is the reality that there's

14   certain activities that we need to track with contractual

15   coverage or not, we -- as a practical matter, we have to

16   continue.  And that's, you know, defending the litigation,

17   where we're the surrogate for the United States of America.

18           THE COURT:  So, the direct economic injury is that

19   you would like to -- you would like to be offered more to do

20   something that you were -- you're stuck having to do because

21   of a prior contract and that the Government -- that the

22   Government might be obligated to pay you for because of the

23   prior contract anyway?

24           MR. OLIVER:  Well, I wouldn't quite put it that

25   way.

1            THE COURT:  Okay, all right.  And I yield the floor

2     if you have a friendly amendment to that.  Well, see, it's

3     just -- I mean, usually, the direct economic stake is that

4     you're going to lose a contract.  But here it's that you

5     don't want the contract.  You would rather have a better one.

6     But that would be the case in every -- that would mean that

7     every single contract that's awarded by the Government could

8     always be objected to by every single party who wants to bid

9     merely on the ground that they would rather have more

10    generous terms.

11            MR. OLIVER:  Well, even in a competitive

12    environment, there's nothing to stop various offerors from

13    filing pre-award protests challenging terms and conditions.

14    And then that risk exists today in the competitive world.

15            THE COURT:  Yeah, but it's usually not based on we

16    think that they should be more generous in what they're

17    offering.  I mean, you could -- I mean, in theory, I suppose,

18    a person could object to the solicitation.  Let's say there's

19    a solicitation to buy five cars and they'd make more money if

20    they sold seven cars because they'd have two more -- the

21    profit on two more.  So, I suppose they could bring an

22    objection, come to our court and say that it was arbitrary

23    for the Government to pick five because seven's better than

24    five, it's bigger.  They wouldn't win, though.

25            MR. OLIVER:  But it's not a question of whether

1    they would win, which is on the merits.  The question is

2    whether there would be jurisdiction to hear that protest.

3    And if they could show, for some reason, that five contracts

4    was unreasonable, according to industry customs and whatever,

5    they might have a chance.

6              THE COURT:  I guess under those circumstances,

7    though, because there was a request for proposals in the

8    plural and there was more than one party looking at it, I

9    mean, that's why we would have jurisdiction, though, because

10   it's -- we're being referees in competitive circumstances or

11   circumstances that would be competitive but for the

12   Government's attempt to place it with one party but -- to

13   place a contract with one party.

14             But I understand your argument.  I'm not sure I

15   entirely get it, but I can -- I will -- I can look further at

16   this.  But, so, the injury is narrowly that you're going to

17   have to do things anyway and you're going to be out of pocket

18   costs anyway and you would prefer that the Government make a

19   better offer of how to pay you for it.

20             MR. OLIVER:  Certainly, we would -- we would seek a

21   solicitation that's compliant with the FAR which says that

22   it's -- under these circumstances, it's not appropriate to

23   have a firm-fixed-price contract.

24             THE COURT:  But isn't it speculative that if you

25   tell the -- if you don't -- aren't you merely speculating

1    that if you tell the Government it's not appropriate to do

2    this as a firm-fixed-price contract, because of the amount of

3    uncertainty involved, it's impossible to accurately estimate

4    that -- you're speculating that their response won't be, hmm,

5    okay, how about this then, how about a proposed three-month

6    contract under a cost reimbursement.  How much do you think

7    it will be?  I mean, we don't know.  You're not really

8    injured until you're incurring costs that can't be paid for

9    in some way.

10          And if the Government's offering to do it in a way

11   you don't like, as of now, you're not bound by -- you're not

12   bound to do it and be paid on a basis that you don't like.

13   You can still negotiate and try to improve the -- improve

14   their offer and get a better deal.  If the Government --

15          MR. OLIVER:  But, Your Honor, we have been trying

16   -- the Government announced almost one year ago that calendar

17   year 2013 must be done on a firm-fixed-price basis.  And we

18   have attempted every way possible, in many communications,

19   seeking to get them to reverse that position.  And they have

20   consistently and uniformly denied our requests and insisted

21   upon a firm fixed price.  And after the number of denials

22   that we've received, which is certainly on the order of five

23   or six direct responses from the contracting officer, it

24   seems unlikely that they're going to turn around and say,

25   well, let's negotiate something different here.  They are

1    insisting upon a firm-fixed-price contract.

2         THE COURT:  Now, the American Federation of

3    Government Employees case, which the Circuit -- I believe

4    it's the one in which they adopted the interested party

5    definition from SECA for purposes of our jurisdiction under

6    the ADRA.  It seems -- on one page of it -- I think it's page

7    1301 of the decision, it's noted that Congress -- "Congress

8    could have intended to give the Court of Federal Claims

9    jurisdiction over any contract dispute that could be brought

10   under the APA."

11        But then the Court later goes on to interpret the

12   references to the bid protest -- to bid protest -- the

13   various references in the legislative history as being

14   references to bid protest cases, which then they decided to

15   limit to disappointed bidders.

16        Again, it seems that what the Circuit was trying to

17   do was trying to -- by having us use the SECA standing is the

18   SECA standing applied to either disappointed bidders or

19   would-be bidders.  And to the extent that it was broader than

20   that in the corrective action cases, in the corrective action

21   cases, somebody who won, the Government seeking to make them

22   a bidder again by a new solicitation, which is being objected

23   to.

24        But after you clearly seem to consider whether this

25   was -- whether the broad language intended jurisdiction over

1    any contract dispute and instead was limited -- was focusing

2    on traditionally what were understood to be bid protests,

3    and, again, there have never any bid protests like yours,

4    right?

5            MR. OLIVER:  Yes, Your Honor.  We recognize that

6    we're covering some new ground here.

7            THE COURT:  Okay.  Okay.  Well, I'll look again at

8    your papers and I'll look again at the matters that you cite.

9    But, I mean, it seems to me -- the difficulty I see is that,

10   first, I'm not sure that this is not -- I'm not sure that

11   what is being negotiated between KBR Services and the

12   Government is something that is distinct from the previous

13   contract, notwithstanding the statutory limitation on the

14   performance of it.

15           And if it were part of the previous contract that

16   the CDA would then apply.  If it's not -- even if it's not a

17   CDA claim coming out of that previous contract, I'm not sure

18   that it's a matter that comes into our bid protest

19   jurisdiction because it's not a competitive injury you're

20   talking about, merely that you would rather have better terms

21   offered to your client personally than they're being offered.

22           And that, third, that it's hard for me to see what

23   the direct economic interest is in turning down a -- we're

24   not talking about an injury maybe.  We're talking about

25   insult instead.  You're being asked to do something for less

1    than the price that it's worth.  But in that regard, I

2    understand your point that the previous contract sort of

3    requires you to have done these things, but that also makes

4    it hard for me to see why the previous contract isn't the

5    vehicle for bringing something.

6             But I'll take a close look at it before I rule on

7    the motion.

8             MR. OLIVER:  Thank you, Your Honor.

9             THE COURT:  Mr. Hontos?

10            MR. HONTOS:  Thank you, Your Honor.

11            THE COURT:  Are you still there?

12            MR. HONTOS:  I will be relatively brief.  A lot of

13   this ground was covered and I think we've covered a lot of

14   the ground in our briefs as well.  You know, I didn't hear

15   anything from KBR today that really grapples with the Federal

16   Circuit's decisions in Weeks Marine, SATECH, Orion, Comint.

17   All of these cases, Your Honor, say that a non-trivial

18   competitive injury is required.

19            That was the issue in Weeks Marine.  At 1361, the

20   Court says that, you know, it had not -- did not have the

21   occasion to discuss what is required to prove a direct

22   economic interest.  And it goes on to conclude that what that

23   means is a non-trivial competitive injury.

24            KBR concedes on pages 14 and 15 of its brief --

25            THE COURT:  Which page -- which page was that?

1          MR. HONTOS:  -- that it can't make that showing.

2          THE COURT:  Which page was that on?

3          MR. HONTOS:  From Weeks Marine?

4          THE COURT:  Yeah.  Was that --

5          MR. HONTOS:  That's at 1361, Your Honor.

6          THE COURT:  1361, thank you.

7          MR. HONTOS:  So, KBR has conceded that it cannot

8     make the showing that is required by the Federal Circuit.

9     That is the end.

10          Now, let's just assume for a second that somehow

11    KBR could overcome that hurdle for purposes of standing.

12    Just assume it.  KBR's complaints should still be dismissed

13    on the basis of standing, and that's because it bumps right

14    up against the rule that awardees, like KBR, cannot file bid

15    protests.  The Court pointed out SATECH.  Now, this is a case

16    that KBR relied on and they thought that it -- apparently,

17    that it helps KBR.

18          SATECH involves corrective action.  And as the

19    Court recognized, there are a handful of cases from this

20    Court that sort of carve out the corrective action situation.

21    I think the buzz phrase is "de facto."  And that's Jacobs

22    Technology, SB Systems, Sendtech, a lot of those cases

23    specifically carve out that situation.

24          That's not at all the situation we have here.

25    There is an ocean of authority we cite in our motion to

1    dismiss at pages 15 and 16.  We cite, you know, tons of cases

2    that -- for the proposition that an awardee does not have

3    standing to file a bid protest.  So, that is totally

4    independent of all of this discussion that KBR has had and

5    all this invitation for the Court to disregard Weeks Marine

6    --

7            THE COURT:  Now, Mr. Hontos, on that particular

8    point, all -- the very -- I agree that there are a number of

9    cases from our court that have held that an awardee has to

10   bring a matter under the CDA rather than under the bid

11   protest jurisdiction if it could be -- even if it could be

12   worded to come under the bid protest jurisdiction.

13           The thing I find a little odd, though, is that the

14   cases rely on -- the appellate authority that the cases at

15   our level rely on are matters like Ingersoll Rand, which is

16   this D.C. Circuit case, which, frankly, the reasoning didn't

17   make any sense to me.  It didn't -- it seemed actually

18   inconsistent with the way the Federal Circuit deals with

19   corrective action challenges.

20           But the Federal Circuit case that's cited is Dalton

21   vs. Sherwood Van Lines, which talked about how the CDA is the

22   exclusive remedy when it applies and that this -- but that

23   it's a more specific statute dealing with transportation and

24   treatment of bills of lading and all and it had this other

25   procedural -- different review mechanism, going to different

1    tribunals, different limitations periods, et cetera, than the

2    CDA, was a more specific thing which then sort of displaced

3    the CDA.

4            What I find interesting, though, is that that case,

5    Dalton, was a Federal Circuit case from 1995.  So, this

6    actually predates the ADRA.  And while there seems to have

7    been dictum in Federal Circuit cases since then, which cites

8    back occasionally to the Dalton determination about the CDA

9    being the exclusive remedy, it's always in the context either

10   of the -- of a CDA claim just describing generally or dealing

11   with some deficiency with the CDA claim where -- like

12   something not being certified that was supposed to be

13   certified or something like that.  It never deals with how

14   you construe the CDA versus how you would construe the ADRA.

15           So, at least, as far as the Circuit goes, it seems

16   to me it might be an open question that the -- just as the

17   transportation bill that was more specific than the CDA for

18   purposes of transportation procurements took the place of the

19   CDA that, perhaps, the bid protest jurisdiction, under the

20   ADRA, might displace the CDA if they both can be found to

21   apply since that might be a more specific thing for the

22   context of particular protests.  The things that you can

23   complain about under the CDA is broader than the sort of

24   things you can complain about under the bid protest

25   jurisdiction.  So, it's a more specific, more narrow

1     approach.

2             So, at least I find that -- that the Federal --

3     that our court keeps relying on old Federal Circuit precedent

4     that is pre-ADRA.

5             MR. HONTOS:   Sure.   And I think that -- you know,

6     it's a fair point that the Court points out.   I think that

7     the core -- you know, I guess the driving point is that when

8     the CDA applies, it is the exclusive mechanism.   And there's

9     no suggestion that I'm aware of that ADRA or any other law

10    that is relevant to this protest sort of changes that

11    calculus.

12            One other court's decision that I would direct the

13    Court to, a Federal Court -- Federal Circuit decision, I'm

14    sorry.   Take a look at Todd Construction 656 F.3d at 1314.

15    And this -- it doesn't get exactly to the Court's point, but

16    I think it sort of provides a little bit more of a recent

17    buttressing in recognition.   And that's -- in Todd, the

18    Federal Circuit said that CDA jurisdiction exists when the

19    claim has some relationship to the terms of performance of a

20    government contract.

21            And so, that, again, underscores that when we're

22    talking about performance, when we're talking about the terms

23    of a contract, which, you know, listening to Mr. Oliver, it

24    feels like we're waist deep in contract performance and

25    negotiation, that the CDA applies, and that is the exclusive

1    remedy.  So, I think, you know, I would direct the Court to

2    Todd.

3              I recognize the Court's point.  Certainly, there

4    are numerous decisions of the Federal -- Court of Federal

5    Claims that have recognized the point.  So, I do think it's a

6    pretty well-established principle.  I guess I don't see any

7    reason to depart from it.

8              THE COURT:  Okay.  But under that prin -- even if

9    that principle were applying, it would apply if what they're

10   complaining about is something that could be brought under

11   the CDA.  Now, if the Government were to require the --

12   require KBR Services to perform close-out activities on a

13   firm-fixed-price basis, would they be able -- would they then

14   be able to bring a CDA claim?  Does the Government concede

15   that that would enable them to bring a CDA claim challenging

16   the propriety of a firm-fixed-price reimbursement rather than

17   a cost reimbursement?

18             MR. HONTOS:  Well, that seems to me to be akin to a

19   change in pricing under a contract.  KBR says the pricing --

20   the existing pricing was you're going to pay me X, you know,

21   or these -- you're going to pay me on these terms.  The

22   Government says, no, we're going to change that up and

23   that's, wow, a garden-variety breach claim.

24             THE COURT:  So, the Government concedes that if KBR

25   were required to do the close-out activities for this

1    calendar year on a cost reimbursement basis that they would

2    not be precluded, because of Weeks Marine or something, from

3    bringing a CDA challenge to the propriety of that method of

4    reimbursement?

5            MR. HONTOS:  Well, I can't definitively concede,

6    Your Honor.  I haven't considered all the jurisdictional

7    arguments that might exist and --

8            THE COURT:  But if that's the case, then the CDA

9    wouldn't apply and that would mean that as a -- wouldn't that

10   mean that then they could still bring it under the bid

11   protest jurisdiction?

12           MR. HONTOS:  Well, no, it's not --

13           THE COURT:  The exclusive remedy wouldn't kick in?

14           MR. HONTOS:  Yeah, it's not the flip side of the

15   coin.  I mean, you have to satisfy the bid protest

16   jurisdiction, full stop, or you have to satisfy the CDA

17   jurisdiction, full stop.

18           Now, this awardee rule, that when you have a

19   situation where you're the awardee of a contract, you hold

20   that in your hands --

21           THE COURT:  Mm-hmm.

22           MR. HONTOS:  -- you don't get to bring a bid

23   protest, and that's a corollary of the principle of the bid

24   protest law that we've been talking about.

25           So, I don't know if they're exact mirror images of

1    each other.  I think, you know, one doesn't exist to provide

2    a remedy for the other.  It's not like you don't have one

3    where you're guaranteed to have another.  There might be a

4    situation where, you know, you don't have anything.  If you

5    don't have a contract and you're not a bidder, or to use the

6    Court's example, if you're -- you know, you fail the standing

7    threshold for purposes of bid protest because you have no

8    ability to show prejudice in terms of submitting a bid and

9    you don't have a government contract, well, you might be out

10   of luck in that situation.  You don't have a cause of action

11   against the Government.  That doesn't mean that there should

12   be, you know, we should be creating one or that the absence

13   of a remedy necessarily means that we should be implying a

14   remedy in that situation.  I think we have to be careful

15   about that.

16             THE COURT:  Okay.

17             MR. HONTOS:  The other piece that I'd like to

18   address on this standing thing -- and, again, even assuming

19   this whole, you know, adopt a new test or ignore the Weeks

20   Marine test works, and even assuming the Court says, well,

21   for standing purposes, the awardee rule -- what I'll call the

22   awardee bar -- doesn't apply in this case, the Court should

23   still dismiss on standing grounds.

24             And this gets into what KBR discussed a little bit

25   and the Court discussed.  The scope of the rule that KBR is

1    advocating is quite breathtaking.  And, now, they've finally

2    conceded that it's on new ground or whatever, whereas before

3    it was there's nothing unusual about this protest.

4         But there is no -- there is no CDA law.  There is

5    no CDA jurisdiction if KBR's position holds.  Everything will

6    be brought as a bid protest.  And I think that's a very real

7    concern.  Lawyers are prone to running to raise the oracles

8    and slippery slopes and all of that, and I recognize that.

9    But I think, in this case, it's appropriate.

10        THE COURT:  But wouldn't it only be the case in

11   which you're alleging that there -- in which the contractor's

12   alleging a violation of statute or regulation?  I mean,

13   certainly, most contract disputes between the Government and

14   a contractor don't involve violations of statutes or

15   regulations, don't they?  I mean, I would hope that the

16   Government -- that it's more just sort of run-of-the-mill

17   breach and equitable adjustment matters.

18        MR. HONTOS:  Well, I think there are a number of

19   cases.  You know, in the main, you know, the Court might be

20   right.  But I think there are a significant number of cases

21   brought that allege that the Government breached because it

22   violated a FAR provision or violated a statute or violated

23   whatever.  So, I do think there's a very real possibility

24   that, you know, you have that -- a very strange situation

25   where just about anybody can dress up a breach claim in bid

1   protest clothes.

2           And then, you know, you've got this strange -- you

3   know, different remedies apply as the Court well knows under

4   1491(a) and 1491(b).  And so, it's a very, very sort of

5   strange and, I think, troubling argument.  And that -- and

6   KBR really doesn't have an -- a response to it, Your Honor.

7   The Court pressed them for a response to it and it was

8   basically nothing.  I mean, if there was some limiting

9   principle articulated at least that would be something.  But

10  KBR's got nothing.

11          So, I think that's illustrative of the fact that

12  it's just not that well thought out and it doesn't make a lot

13  of sense in this case or in any case for that matter.

14          So, I think there are at least three standing

15  hurdles to get over and the focus -- and I'm not going to get

16  into the other issues in the case, and I know the focus of

17  this hearing and KBR's request is for that competitive injury

18  problem.  So, I'm not going to go there.  But, ultimately,

19  the Court could assume -- and, again, we disagree with this

20  -- but the Court could assume that there's some direct

21  economic test or that non-trivial competitive injury is not

22  required and KBR would still lose and still lose on standing.

23          And I haven't even talked about ripeness, I haven't

24  even talked about FASA or any of those things, and I won't

25  talk about them unless the Court wants me to.  So, there's

1    just nothing out there, no authority that we're aware of, of

2    any case that looks like this.  I think that's telling.

3              And I take the Court's point that, you know, every

4    -- every proposition of law, no matter how well established,

5    is, at one point, an issue of first impression.  But, you

6    know, there's just no sound basis for sort of crafting a

7    remedy in this situation.  It's really doing violence to a

8    number of principles of bid protest law to accommodate KBR's

9    unhappiness about issues that are arising in contract

10   performance.

11             Unless there are any further questions, I'd ask

12   that the Court grant the Government's motion to dismiss.

13             THE COURT:  Okay.  I think I've got no further

14   questions.

15             Mr. Oliver, do you have anything that you want to

16   add at this point or --

17             MR. OLIVER:  Yeah, just very briefly, Your Honor.

18   I'd like to respond that we did provide you quite a major

19   distinction regarding the horribles that Mr. Hontos suggests.

20   And, first of all, it only involved a situation where the

21   work is not under contract and, second, protest to the Court

22   of Federal Claims the issuance of a new task order.

23             So, you know, those are two great limitations to

24   his allegation that this would have a tremendous effect on

25   converting normal contract administration matters into bid

1    protests.  We're talking about a situation that's not covered

2    by contract as opposed to one that is.

3            THE COURT:  Okay.

4            MR. OLIVER:  And that's all I have, Your Honor.

5    Thank you for your patience.

6            THE COURT:  All right.  Well, you're very welcome.

7    Thanks for taking the time to try to educate me again on

8    this.  As I said, I will -- I'll take a close look at your

9    briefs and the cases you've cited and issue an opinion before

10   too long.  But thank you, again, for taking the time.

11           MR. HONTOS:  Thank you, Your Honor.

12           THE COURT:  And you may go.

13           MR. OLIVER:  Thank you so much, Your Honor.

14           THE COURT:  We're now -- thank you very much.

15   We're now adjourned.  Good night.

16           (Whereupon, at 4:19 p.m., the hearing was

17   adjourned.)

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF TRANSCRIBER

2

3          I, court-approved transcriber, certify that the

4    foregoing is a correct transcript from the official

5    electronic sound recording of the proceedings in the above-

6    titled matter.

7

8

9

10   DATE:

11                          ELIZABETH M. FARRELL, CERT

12

13

14

15

16

17

18

19

20

21

22

23

24

25